UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   05/08/2019
```

------------------------------------------------------------X
STEVEN MADDEN, LTD.,                            :
                                                :
                        Plaintiff,              :
                                                :
            v.                                  :
                                                :
YVES SAINT LAURENT and LUXURY                   :
GOODS INTERNATIONAL (LGI) S.A.,                 :
                                                :
                        Defendants.             :
----------------------------------------------------------- :      18-CV-7592 (VEC)
YVES SAINT LAURENT and LUXURY                   :
GOODS INTERNATIONAL                             :      OPINION AND ORDER
(LGI) S.A.,                                     :
                                                :
                        Counterclaim Plaintiffs, :
                                                :
            v.                                  :
                                                :
STEVEN MADDEN, LTD. and                         :
STEVEN MADDEN RETAIL, INC.,                     :
                                                :
                        Counterclaim Defendants. :
----------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

This case concerns fashion knock-offs.  Yves Saint Laurent and Luxury Goods

International (LGI) S.A. (collectively "YSL") have accused Steven Madden, Ltd. and Steven

Madden Retail, Inc. (collectively "Madden") of producing and selling five types of sandals that

are knock-offs of YSL designs.  YSL alleges Madden has violated  federal patent and trademark

laws and state laws concerning unfair competition, deceptive business practices, and injury to

business reputation.  Madden has moved to dismiss all claims by YSL for failure to state a claim.

Madden's motion is GRANTED in part, with leave to amend.

I.       **Background**[1]

On August 20, 2018, Steven Madden, Ltd. filed a complaint seeking a declaration that its so-called "Sicily" flat sandal does not violate U.S. Design Patent No. D607,187 ("the '187 Patent"), which is owned by YSL, or any trade dress rights that YSL may own.  Dkt. 1 at 28. The '187 Patent appears to be the blueprint for YSL's "Tribute" high-heeled sandal, which YSL alleges has been a particularly popular style that has garnered widespread and unsolicited media coverage.  Countercl. (Dkt. 28) ¶¶ 20, 28.  YSL has counterclaimed that five of Madden's shoe designs, including the "Sicily" flat, infringe the '187 Patent and violate YSL's trade-dress rights under the Lanham Act.  *Id.* ¶¶ 54, 70, 80.

YSL has a series of "Tribute" sandals, which may be either flat-soled or high-heeled and vary significantly in appearance.  Countercl., Ex. B.  "Tribute" sandals, however, all share at least one design feature in common: the toe bed.  Countercl. ¶ 30.  The toe bed refers to the part of the sandal that frames and secures the toes and the top third of the foot.  YSL claims that the "Tribute" toe bed consists of a unique weaving pattern that makes its sandals readily identifiable to consumers.  As can be seen below, the "Tribute" toe-bed pattern consists of four interwoven straps—two U-shaped components, a ring-shaped piece, and a horizontal strap that bisects and connects together the other three parts.

---

[1]        The Court assumes the truth of all well-pleaded facts in the counterclaims.  *Feingold v. Chrismas*, 818 F. Supp. 2d 763, 768 (S.D.N.Y. 2011) ("[T]he Court must accept as true all well-pleaded facts alleged in the counterclaims and draw all reasonable inferences in the claimant's favor." (citing *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir.2007)))



Countercl., Ex. B at 4.

Madden has produced and sold six sandal designs that resemble YSL's "Tribute" design, only five of which are the subject of YSL's counterclaims.  On January 22, 2013, YSL notified Madden that its "Aileenn" sandal was an infringing product:



Countercl., ¶ 65.  Since then, YSL has identified five more Madden shoes that are now at issue, including the "Kananda" and "Kissme" sandals:



Countercl., ¶ 52.  YSL also alleges infringement by Madden's "Kadri" and "Kaiden" sandals:



Countercl., ¶ 71.  And finally, YSL alleges infringement by Madden's "Sicily" sandal, which,

unlike the other disputed sandals, has a flat heel and sole, rather than a high heel and platform

sole:



Countercl., ¶ 81.

      All told, YSL claims that the "Sicily" flat sandal (the subject of Madden's declaratory

action) and four high-heeled sandals—the "Kananda," the "Kissme," the "Kadri," and "the

Kaiden" (collectively "Madden Shoes")—infringe upon YSL's intellectual property, namely the

'187 Patent and trade dress protections afforded to the "Tribute" designs.  Countercl. ¶¶ 99–100,

107.  YSL also claims unfair competition under New York common law, deceptive trade

practices under N.Y. Gen. Bus. Law § 349, and injury to business reputation under N.Y. Gen.

Bus. Law § 360-L.  Madden has moved to dismiss all claims pursuant to Federal Rule 12(b)(6) of Civil Procedure.

## II.   Discussion

"When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), a court must 'accept all allegations in the complaint [or counterclaim] as true and draw all inferences in the non-moving party's favor.'"  *Wine Enthusiast, Inc. v. Vinotemp Int'l Corp.*, 317 F. Supp. 3d 795, 800 (S.D.N.Y. 2018) (quoting *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009)).  A counterclaim "will survive the motion to dismiss as long as it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678) ("Rule 12(b) applies equally to claims, counterclaims, cross-claims and third-party claims.").

Madden has moved to dismiss all of YSL's counterclaims.  *See* Madden Mot. (Dkt. 32) at 1.  As to YSL's patent claim, Madden primarily contends that its "Sicily" flat sandal does not infringe YSL's patent because the patent pertains to a high-heel design.  *Id.*  As to YSL's trade dress claims, Madden argues that YSL's "Tribute" designs are not entitled to trade dress protection.  *Id.* at 1–2.  Madden also seeks dismissal of YSL's state law claims, which are derivative of the federal claims.  *Id.* at 3.

### A.  Patent Infringement

YSL claims that the Madden Shoes directly infringe its '187 patent in violation of 35 U.S.C. § 271.[2]  A patent may be either a utility patent, which protects any "new and useful"

---

[2]   35 U.S.C. § 271 provides, "[e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

invention or improvement, or a design patent, which protects any "new, original, and ornamental design" that is not "primarily functional." 35 U.S.C. §§ 101, 171; *Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 238 (Fed. Cir. 1986). Put differently, a design patent protects the physical appearance of an article, as opposed to its utility. *Wine Enthusiast*, 317 F. Supp. 3d at 800 ("A design patent is directed to the appearance of an article of manufacture."). To determine whether an accused design infringes a patent, courts ask whether an "ordinary observer . . . would be deceived into believing that the accused product is the same as the patented design." *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1303 (Fed. Cir. 2010).

Like many design patents, the '187 Patent does not contain a detailed written description and instead expresses the claimed design through drawings. Countercl., Ex. A. at 2; *Crocs*, 598 F.3d at 1302 ("Design patents are typically claimed as shown in drawings, and claim construction must be adapted to a pictorial setting."). Indeed, the Federal Circuit has "often noted that design patents have 'almost no scope' beyond the precise images shown in the drawings." *MRC Innovations, Inc. v. Hunter Mfg., LLP*, 747 F.3d 1326, 1333 n.1 (Fed. Cir. 2014). YSL's patent contains seven different views of its sandal concept, two of which are reproduced below:



Fig. 3          Fig. 7

Countercl., Ex. A at 4, 6.

Because the scope of the YSL patent is limited to its drawings, the critical question is whether YSL has plausibly alleged that an ordinary observer would mistake the Madden "Sicily" flat sandal for the high-heeled sandal depicted in the '187 Patent. The accused design need not be identical to the patented design to constitute infringement. *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 991 (Fed. Cir. 1993) ("[M]inor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement." (citation omitted)). Nevertheless, the two designs must be "substantially the same," such that the resemblance is likely to deceive an ordinary observer and induce him or her to purchase one design supposing it to be the other. *Id.* at 990 (quoting *Gorham Co. v. White*, 81 U.S. 511, 528 (1871)). To determine whether designs are substantially the same, the Court must examine the designs "as a whole," rather than viewing "small differences in isolation." *Crocs*, 598 F.3d at 1303–04. To perform the ordinary observer analysis, courts employ a "side-by-side" comparison of the accused product and the drawings of the patented design:

| YSL '187 Patent | Madden "Sicily" |
|---|---|
|  |  |



Fig. 3

Compl. ¶ 68; Countercl. ¶ 81, Ex. A at 4; *Crocs*, 598 F.3d at 1304.

As is immediately apparent, there are numerous visual differences between the "Sicily"
flat sandal and the high-heeled sandal contemplated by Patent '187.  Notably, YSL's patented
design has not only a high heel, but an arch, a platform sole, an ankle strap, and a vertical strap
connecting the ankle strap to the weaved toe bed.  Indeed, the toe bed appears to be the *only*
aspect in common.  While the toe bed is a prominent characteristic that could mislead consumers
as to the origin of the "Sicily" sandal, which may be relevant to YSL's Lanham Act claims, the
toe bed is only one ornamental feature in the patent and cannot be the sole focus of the ordinary-
observer analysis.  *See Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1578 (Fed. Cir. 1995)
("[T]he focus is on the *overall* ornamental appearance of the claimed design, not selected
ornamental features."  (emphasis original)).  Because YSL's patent encompasses additional
features other than the toe bed, they must all be considered as an integrated whole.  *See In re
Salmon*, 705 F.2d 1579, 1582 (Fed. Cir. 1983) ("A design is a unitary thing and all of its portions
are material in that they contribute to the appearance which constitutes the design.").  When all
of those elements are considered, YSL has not plausibly alleged facts from which the Court can

infer that an ordinary observer, intending to purchase the high-heeled shoe depicted in Patent '187, would be "deceived" into purchasing Madden's flat sandal.  In other words, because so many non-trivial components of the "Sicily" sandal combine to create a different visual effect as a whole, YSL has not plausibly alleged that the two designs are basically the same.  *See Crocs*, 598 F.3d at 1303–04.  To hold otherwise would reduce YSL's patented design of a completed shoe to only its toe bed.

YSL's argument to the contrary depends on outdated case law.  YSL essentially contends that ordinary pleading standards, as articulated by the Supreme Court in *Iqbal* and *Twombly*, do not apply to patent cases, and that this Court may not consider dismissal based on the "ordinary observer" test.  *See generally Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  According to YSL, to survive a Rule 12(b)(6) motion, a claim of patent infringement need only "(1) allege ownership of the asserted patent, (2) name each individual defendant, (3) cite the patent that is allegedly infringed, (4) describe the means by which the defendants allegedly infringe, and (5) point to the specific sections of the patent law invoked." YSL Br. (Dkt. 37) at 9.  For that proposition, YSL cites to *Lennon Image Techs., LLC v. Coty Inc.*, which in turn relies on two decisions that predate *Iqbal* and *Twombly* and are therefore no longer authoritative as to Rule 12(b)(6) standards.  *See* No. 17-CV-9146, 2018 WL 3462517, at *3 (S.D.N.Y. July 18, 2018) (citing *Phonometrics, Inc. v. Hosp. Franchise Sys., Inc.*, 203 F.3d 790, 794 (Fed. Cir. 2000) and *Asip v. Nielsen Media Research, Inc.*, No. 03-CV-5866, 2004 WL 315269, at *2 (S.D.N.Y. Feb. 18, 2004)).

After *Iqbal* and *Twombly*, the Federal Circuit tried to keep alive YSL's preferred notice-pleading standard, but that effort has been superseded by the Federal Rules.  Specifically, the Federal Circuit originally attempted to carve out an exception to *Iqbal* and *Twombly* for patent

cases, reasoning that *Iqbal* and *Twombly* did not (and could not) modify the form complaints in the Appendix of the Federal Rules of Civil Procedure, which were intended to be exemplary pleadings that are *per se* sufficient to survive a Rule 12(b)(6) motion to dismiss.  *See, e.g.*, *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1333–34 (Fed. Cir. 2012) ("[A] pleading, motion, or other paper that follows one of the Official Forms cannot be successfully attacked." (citation omitted)); *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007).  Those Federal Circuit cases relied on Federal Rule 84 of Civil Procedure, which, at the time, gave effect to the forms in the Appendix.  Fed. R. Civ. P. 84 (2014) ("The forms in the Appendix suffice under these rules and illustrate the simplicity and brevity that these rules contemplate.").  The Supreme Court, however, has since abrogated Rule 84, thereby invalidating the form complaints in the Appendix.  Fed. R. Civ. P. 84 advisory committee's note to 2015 amendment.  Accordingly, cases relying on Rule 84 and the form complaints are no longer good law, and YSL can no longer benefit from the less rigorous pleading standard.

Based on the foregoing, Madden's motion to dismiss YSL's patent infringement claim as to the "Sicily" sandal is GRANTED.  Madden's motion to dismiss YSL's patent claim as to all other Madden Shoes is denied.[3]

---

[3]    In a single footnote, Madden makes a wholly separate argument that YSL's attempt to enforce the '187 Patent against the "Sicily" sandal invalidates the entire patent, which would require dismissal of the patent claim as to all Madden Shoes, not just the "Sicily" flat.  Madden Mot. at 12, n.2.  According to Madden, YSL's decision to enforce the '187 Patent against the "Sicily" flat renders the patent claim "indefinite" and therefore invalid.  *Id.*  In doing so, Madden conflates a "claim" in a patent application, which describes the subject matter of the patent, with a legal "claim" alleged in a pleading.  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014) (discussing indefiniteness of patent claim as defined in 35 U.S.C. § 112).  Madden has provided no authority even remotely suggesting that an adequately defined patent could otherwise be eviscerated by the patent-holder's broad or even mistaken litigation position.

### B.  Trade Dress Infringement

"Trade dress" refers to those aspects of a product's presentation or appearance that are so distinctive that they signal the product's origin to consumers.[4]  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 118 (2d Cir. 2001).  Because a distinctive appearance has the same effect as a trademark, it also has the same protections under the Lanham Act as an unregistered mark.[5]  *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997) ("The statutory protection of unregistered trademarks extends to trade dress." (citing 15 U.S.C. § 1125 and *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773 (1992))); *see also Nora Beverages*, 269 F.3d at 119 ("When evaluating trade dress claims, courts must not lose sight of the underlying purpose of the Lanham Act, which is protecting consumers and manufacturers from deceptive representations of affiliation and origin." (citation omitted)).

To state a claim for trade dress infringement under the Lanham Act, the claimant must allege sufficient facts to show that a protectable trade dress exists and that the alleged infringing product is likely to cause confusion as to product origin because of similarities in product appearance.  *Nora Beverages*, 269 F.3d at 118–19.  To allege the existence of a trade dress as a threshold matter, the claimant must ordinarily allege facts from which the Court can plausibly infer that the claimed dress is (1) "distinctive" in terms of identifying the source of the product and (2) "not functional."  *Id.* at 118.  Product features that are "functional", *i.e.*, "essential to the

---

[4]     The term "dress" originally referred to "the manner in which a product was 'dressed up' to go to market with a label, package, display card, and similar packaging elements."  *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995).  Since then, the term "has taken on a more expansive meaning and includes the design and appearance of the product."  *Id.*

[5]     "Section 43(a) of the Lanham Act protects registered and unregistered marks against the use of any word, term, name, symbol, or device 'likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.'"  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 649 (S.D.N.Y. 2016) (quoting 15 U.S.C. § 1125(a)), *aff'd sub nom. LVL XIII Brands, Inc. v. Louis Vuitton Malletier SA*, 720 F. App'x 24 (2d Cir. 2017).

use or purpose of the [product] or . . . affect[ing] the cost or quality of the [product]," are not protectable under the Lanham Act because granting trademark protection would have significant anti-competitive effects. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001) ("[A] functional feature is one the exclusive use of which would put competitors at a significant non-reputation-related disadvantage." (internal quotation marks and citation omitted)).

YSL asserts three related trade dresses: (1) the toe-bed design used in all "Tribute" sandals, (2) the overall design of the "Tribute" high-heeled sandal, and (3) the overall design of the "Tribute" flat sandal.  Madden does not contest, at this stage, that its products are likely to cause confusion, but instead seeks to dismiss YSL's trade dress claims on the basis of distinctiveness and functionality.  Madden Mot. at 13, n.3 ("Madden reserves the right to address the sufficiency of YSL's pleadings as to . . . 'likelihood of confusion.'").  For the reasons discussed below, the Court concludes that YSL has adequately alleged that the "Tribute" toe-bed and the high-heel designs constitute protectable trade dresses; YSL has not adequately alleged that the design of the "Tribute" flat sandal constitutes a protectable trade dress.

### 1. Distinctiveness

YSL has plausibly alleged that two of its three asserted dresses are distinctive.  Generally, a party seeking trade dress protection can prove distinctiveness in one of two ways.  A product's appearance is "distinctive" if it is "inherently distinctive or has acquired secondary meaning in the marketplace." *Nora Beverages*, 269 F.3d at 118; *see also Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001).  Acquisition of secondary meaning is the process by which a product's appearance, while not inherently distinctive at its inception, becomes distinctive as

13

consumers grow to associate it with the maker or sponsor of the product. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

As to infringement claims asserting a trade dress based on a product's design, rather than its packaging or its use of a word or symbol, courts apply a more stringent standard because restricting the use of a design feature may impede fair competition. *Wal–Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000); *Yurman Design*, 262 F.3d at 115. Parties seeking Lanham Act protection for design trade dresses cannot rely on the "inherently distinctive" test and can only establish distinctiveness through the "secondary meaning" test.[6] *Yurman Design*, 262 F.3d at 115; *see Wal–Mart Stores*, 529 U.S. at 209 ("[I]n an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning."). The Supreme Court and the Second Circuit have further held that product features that are "generic" can never acquire distinctiveness through secondary meaning, as that would lead to the creation of overbroad trade dress protections. *Yurman Design*, 262 F.3d at 115 ("[E]ven a showing of secondary meaning is insufficient to protect product designs that are overbroad or 'generic.'"). As a result, in order to allege that a design feature is "distinctive," the party asserting the dress must allege facts that plausibly show that it is (1) non-generic and (2) has acquired distinctiveness through secondary meaning in the marketplace.

All three of YSL's asserted trade dresses pertain to the sandals' design, as opposed to the shoe's packaging or any other feature that is not intended to provide any utility or appeal, such as

---

[6]     In *Wal–Mart Stores*, the Supreme Court concluded that the "inherently distinctive" test causes unacceptable uncertainty in the context of design trade dresses, because restricting the use of a particular design is likely to constrain the utility and appeal of competing products, whereas a typical restriction on packaging or the use of a symbol has little anti-competitive effect. *Id.* at 212–14 (noting that unlike packaging, design choices are generally intended to increase utility or appeal of products).

a word or symbol. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 652 (S.D.N.Y. 2016) ("[P]roduct packaging is generally limited to 'the appearance of labels, wrappers, boxes, envelopes, and other containers used in packaging a product as well as displays and other materials used in presenting the product to prospective purchasers.'"). Like the metal toe plate in *LVL XIII Brands, Inc.*, the toe-bed design (and other aspects of the "Tribute" sandals that YSL seeks to protect) serves aesthetic purposes and is properly evaluated under the Supreme Court's heightened standard for design trade dresses. *Id.* at 654. Accordingly, for YSL to state a valid claim of trade dress infringement, YSL must allege facts from which the Court can plausibly infer that its "Tribute" designs have acquired secondary meaning in the marketplace and are not generic.[7]

YSL has plausibly alleged that its "Tribute" toe-bed and high-heel trade dresses have acquired secondary meaning in the marketplace. According to the Second Circuit, a product's appearance has acquired secondary meaning when "in the minds of the public, the primary significance of [the] product feature . . . is to identify the source of the product rather than the product itself.'" *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216 (2d Cir. 2012) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982)). The analysis depends on a variety of factors, including unsolicited media coverage, sales success, and frequency of plagiarism by competitors. *See LVL XIII Brands*, 209 F. Supp. 3d at 654. Here, YSL's counterclaim alleges that its "Tribute" sandals have become "iconic"

---

[7]        Madden, however, appears to concede, at least at this stage, that YSL's "Tribute" designs have acquired secondary meaning in the marketplace. *See* Madden Mot. at 13, n.3 ("Madden reserves the right to address the sufficiency of YSL's pleadings as to the 'secondary meaning' and 'likelihood of confusion' elements of trade dress."). Madden instead appears to be arguing for the application of the inherently-distinctive test—a standard that no longer applies to design trade dresses under Supreme Court precedent. *See Wal–Mart Stores*, 529 U.S. at 209. Liberally construed, Madden's arguments could be contending that YSL's designs are too "generic" to acquire distinctiveness in the marketplace. *See Two Pesos*, 505 U.S. at 769 (holding that "generic" features cannot acquire distinctiveness through secondary meaning).

and have garnered unsolicited coverage in popular media, including having been prominently

worn by numerous celebrities.  Countercl. ¶¶ 21–27.  YSL has further alleged that the weaving

pattern used for the toe bed has become an identifying feature because it is replicated across the

"Tribute" series.  *Id.* ¶¶ 29–30.  When examining the sandals in the "Tribute" series, one can

infer that the toe-bed is the most striking feature and that it contributes to a consistent look across

various versions of the "Tribute" sandal.  In sum, YSL's description of the "Tribute" design,

combined with the drawings and photographs of the sandals,[8] and the alleged visibility of the

"Tribute" heel in the marketplace support an inference that the YSL's "Tribute" toe-bed and

high-heel designs have acquired a secondary meaning so as to become recognizable to

customers.

Indeed, Madden's own submission indicates that consumers have come to associate the

physical appearance of the "Tribute" heel with the YSL brand.  Exhibit 1 to Madden's motion to

dismiss is a post on a fashion blog, titled "Real vs. Steal – YSL Tribute T-Strap Platform

Sandals," which is explicitly aimed at collecting perceived knock-offs of the YSL "Tribute"

high-heeled sandal.  Madden Mot., Ex. 1 at 2–3; *see Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400,

428 (S.D.N.Y. 2012) ("Evidence that a mark has been widely copied is persuasive evidence of

secondary meaning because it demonstrates that the mark has become a strong source identifier

---

[8]        Although Madden claims that YSL has merely recited a laundry list of features that are not distinctive,
courts in this circuit have recognized "the difficulties that a [party seeking trade dress protection] faces in
articulating an artistic 'look' . . . , and concluded that the [party] need not present a perfect textual articulation of its
trade dress."  *R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 78 (S.D.N.Y. 2009) (citing *Yurman Design*, 262 F.3d
at 117).  Rather, where the asserted trade dress is largely "decorative or artistic," the party seeking trade dress
protection need only "fairly put the [opposing party] (and factfinder) on notice of the distinctive elements and
features of the trade dress at issue."  *Id.*  In other words, a litigant may point out, through a combination of verbal
descriptions and visual depictions, the elements that create a product's distinctive appearance.  *Id.*  In this case, the
Court concludes that Madden has fair notice of the overall look created by the "Tribute" toe-bed design and the
visual effect of the "Tribute" sandals that YSL claims to be protected.

in the eyes of the purchasing public." (citation omitted)).  The blog post also identified the "Tribute" heel as "the 'It' shoe of the year," because it "is a hit among celebrities, fashion connoisseurs, and [] totally obsessed shoe freaks"—further showing that the "Tribute" heel has acquired secondary meaning in the marketplace.[9]  Madden Mot., Ex. 1 at 2.

YSL has also plausibly alleged that the "Tribute" toe-bed and heel designs are non-generic.  A particular design is considered "generic" if it is typical of the product at issue—that is, it "refers to the genus of which the particular product is a species."  *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985).  For instance, "where it is the custom of an industry to package products in a particular manner, a trade dress in that style would be generic and therefore not inherently distinctive."  *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) ("[P]ackaging lime-flavored soda in green twelve-ounce cans is so common in the soft drink industry that such packaging probably is not inherently distinctive.").  In this case, while a toe bed is a typical feature of a sandal, one cannot fairly describe YSL's design choice, of using four interwoven straps of varied shapes to create a rounded and balanced visual effect, as characteristic of all or even most sandals.[10]  Similarly, YSL has plausibly alleged that the "Tribute" heel design is a non-generic combination of, among other features, the distinctive toe-bed, an inward-sloping platform sole, a stiletto heel, and a vertical strap that runs from the ankle strap to the toe bed.  Countercl. ¶ 38.

---

[9]      Comments on the blog post also suggest that a significant number of consumers have sought knock-offs of the "Tribute" sandal because the YSL original is too expensive.  Madden Mot., Ex. 1 at 16–18.

[10]      Madden claims that YSL's design is not protectable, because many other sandals have a similar appearance.  While the ubiquity of a design could indicate that a design is generic, that logic does not apply when the proliferation of similar designs appears to be the work of copycats.  In other words, rather than designers independently making similar footwear because the design is dictated by industry practice or the shoe's function or purpose, other shoemakers are specifically imitating YSL's look, which would indicate that YSL's design is non-generic and readily recognizable.  *See* Madden Mot., Ex. 1 at 16–18.

17

Although Madden contends that YSL's design is not distinctive because it consists of generic, commonly used elements, this argument misses the point. "While each of the [] elements individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness." *See Paddington Corp.*, 996 F.2d at 584. Indeed, "[t]rade dresses often utilize commonly used lettering styles, geometric shapes, or colors, or incorporate [non-distinctive] elements" to create a distinctive combination. *Id.* If accepted, Madden's argument would virtually obliterate design trade dresses as a concept, because designs almost invariably utilize the same building blocks. Instead, the Court concludes that YSL has plausibly alleged facts from which the Court can infer that the "Tribute" heel is a combination of specific design choices that are not shared by high-heeled shoes generally.

In contrast, YSL has not plausibly alleged that the "Tribute" flat is sufficiently distinctive as to embody a separate trade dress in its own right. While the "Tribute" flat may be recognizable as a YSL sandal, it appears to derive distinction purely from the toe-bed design. As YSL itself has explained, the "Tribute" flat is merely the "Tribute" toe bed, paired with "a substantially flat sole." Countercl. ¶ 44. A "substantially flat sole," on its own, is undoubtedly a generic and functional feature of flat sandals. YSL has not adequately alleged that the "Tribute" flat sandal is a non-generic expression of the "Tribute" toe bed or that the flat sandal has acquired secondary meaning in the marketplace. Rather, the allegations regarding media coverage and other considerations relevant to secondary meaning appear to be limited to the "Tribute" heel and the toe bed's contribution to the overall look of "Tribute" sandals, rather than the "Tribute" flat specifically. *See* Countercl. ¶¶ 26, 28–29, 30. Without additional allegations

18

regarding secondary meaning and the non-generic design of the "Tribute" flat, YSL has not plausibly alleged that the sandal design constitutes a separate trade dress.

For these reasons, the Court concludes that YSL has plausibly alleged the distinctiveness of the "Tribute" toe-bed and "Tribute" heel dresses but not as to the "Tribute" flat dress.

### 2. Non-Functionality

Because YSL has not adequately alleged that the "Tribute" flat sandal is an independent trade dress, the Court need only address whether YSL has plausibly alleged that the "Tribute" toe-bed and heel designs are non-functional and therefore eligible for trade dress protection. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature."[11] *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 164 (1995). YSL has plausibly alleged that protecting their "Tribute" toe-bed and heel designs would not have significant anti-competitive effects.

According to the Second Circuit, the functionality determination is a two-tiered test. First, the Court must consider whether the relevant design has "utilitarian" functionality. *Christian Louboutin*, 696 F.3d at 219–20. If not, the Court must consider whether the design has "aesthetic" functionality. *Id.* Under the Lanham Act, the party seeking protection for an unregistered trade dress bears the burden of proving non-functionality under both standards. *See* 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade

---

[11]     As the Second Circuit has explained, useful "functional features can be protected only through the patent system, which grants a limited monopoly over such features until they are released into general use." *Christian Louboutin*, 696 F.3d at 218–19.

dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.").

A product feature has utilitarian functionality if "it is (1) 'essential to the use or purpose of the article,' or if it (2) 'affects the cost or quality of the article.'" *Id.* (quoting *Inwood Labs.*, 456 U.S. at 850 n.10).  A feature is "essential" "if [it] is dictated by the functions to be performed" by the article.  *Id.* (citation omitted).  A feature "affects the cost or quality of the article where it permits the article to be manufactured at a lower cost or constitutes an improvement in the operation of the goods."  *Id.* (citation omitted).

YSL has plausibly alleged that its designs are not functional in a utilitarian sense.  As YSL has pointed out, "there are countless other means of assembling a shoe design that do not involve" the same combination of straps employed in "Tribute" sandals.  Countercl. ¶ 33.  Nor is there any reason to believe that the "Tribute" toe bed or heel is particularly effective, comfortable, or cost-efficient.  *See Christian Louboutin*, 696 F.3d at 219 n.14 (noting that biscuit-shaped design was considered utilitarian because alternative shapes would be more expensive to produce).  In other words, while a toe bed and other components of a shoe are "functional" in the colloquial sense, allowing YSL to have exclusive use of the designs in this case does not preclude Madden and other competitors from creating alternative permutations that are equally useful and effective.  *See Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 607 (S.D.N.Y. 1979) ("Of course, the fact that [water-resistant fabric, double-ended zippers, and cotton straps of a bag] serve a utilitarian function does not detract from the fact that in terms of design they may be essentially nonfunctional.").

For similar reasons, YSL has also plausibly alleged that its designs are not functional in an "aesthetic" sense.  *Christian Louboutin*, 696 F.3d at 219–20.  A product feature does not have

"aesthetic functionality" merely because the feature has aesthetic value.  Rather, "when the aesthetic design of a product is itself the mark for which protection is sought, [the Court may] deem the mark functional if giving the markholder the right to use it exclusively 'would put competitors at a significant non-reputation-related disadvantage.'"  *Id.* (quoting *Qualitex*, 514 U.S. at 165).  Competitors suffer a "significant" disadvantage if granting trade dress protection would unfairly "limit[] the range of adequate alternative designs" or restrict the use of a feature that is "necessary to compete in the relevant market."  *Id.* at 221–22 (citations and brackets omitted).

In this case, YSL's "Tribute" designs are highly specific and do not appear to significantly alter the range of options available to Madden and other competitors.  As a point of reference, in *Christian Louboutin*, the Second Circuit determined that restricting competitors from using red outsoles would unduly constrain competition—but seemed to indicate that the use of red outsoles that contrast with the remainder of the shoe would be protectable.  *See* 696 F.3d at 225 ("[T]he Mark as it currently stands is ineligible for protection insofar as it would preclude competitors' use of red outsoles in all situations.").  The Supreme Court has also indicated that the exclusive use of a particular color might not have anti-competitive effects that would render the color ineligible for trademark protection.  *See Qualitex*, 514 U.S. at 174 ("[A] color may sometimes meet the basic legal requirements for use as a trademark.").  If granting a litigant exclusive use of a contrast-colored sole or a particular color may not have significant anti-competitive effects, then surely exclusive use of the "Tribute" designs, which consist largely of an arbitrary combination of sandal straps, would not.  Indeed, this case is similar to *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, where the Second Circuit held that a sweater's depiction of leaves, squirrels, and other fall motifs is not functional, despite having aesthetic appeal, because

competitors can still use fall motifs to create alternative designs that do not cause product confusion.  *See* 71 F.3d 996, 1006 (2d Cir. 1995).  Here, there are similarly innumerable ways of securing a foot to a sandal, many of which are at least as appealing as YSL's designs and would not cause confusion.  In short, YSL has adequately alleged that functionality doctrine does not render the designs at issue in this case ineligible for trade dress protection.

*        *        *

In sum, the Court concludes that YSL has plausibly alleged that its "Tribute" toe-bed and high-heel designs are distinctive and non-functional and therefore eligible for trade dress protection under the Lanham Act; YSL has not plausibly alleged that the YSL "Tribute" flat design is distinctive and eligible for protection.

### C.  YSL's State Law Claims

Madden also seeks dismissal of YSL's derivative state law claims, on the basis that YSL has not alleged a protectable trade dress.  Because the Court concludes that YSL has failed to allege a protectable trade dress as to the "Tribute" flat sandal, Counts VI through VIII are dismissed to the extent that they are premised on any alleged violation of the "Tribute" flat trade dress.  Madden's motion to dismiss Counts VI through VIII is otherwise denied.

### III.   Conclusion

For the foregoing reasons, the Court GRANTS Madden's motion to dismiss as to Count IV of YSL's Counterclaims, which asserts infringement of the "Tribute" flat trade dress, and as to YSL's state law claims only to the extent that they pertain to the "Tribute" flat trade dress.  YSL is GRANTED leave to amend its counterclaims to allege additional facts from which one can infer that the "Tribute" flat sandal is distinctive and protectable as a trade dress.

The Court further GRANTS Madden's motion as to Count I, only to the extent that Count I pertains to patent infringement by Madden's "Sicily" flat sandal.  YSL is DENIED leave to amend as to Count I, because the Court finds that any amendment as to the "Sicily" flat would be futile in stating a patent infringement claim.  *See Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

Madden's motion to dismiss is DENIED in all other respects.  The Clerk of Court is respectfully directed to terminate the open motion at docket entry 31.

**SO ORDERED.**

**Date:  May 8, 2019**
**New York, NY**

**VALERIE CAPRONI**
**United States District Judge**